This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 20 July 2000 as:
 STIPULATIONS
1. The employee is Rebecca C. Harrison.
2. The employer is Lucent Technologies.
3. The servicing agent for the self-insured employer is Lucent Technologies Disability Benefits.
4. At all relevant times, defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. The employer and the employee relationship existed between the employer and the employee on or about August 19, 1999, the date of the alleged compensable injury reflected on I.C. File Number 970192, and on May 21, 1999, the date of the alleged compensable injury IC File Number 970196.
5. A Form 22 is stipulated to by the parties that demonstrates an average weekly wage of $656.89 and a weekly compensation rate of $437.93
In addition, the parties stipulated into evidence the following:
1. Medical records marked as Defendants Exhibit 1, except that plaintiff objected to medical records that were too remote on relevancy grounds.
2. Exhibits 2, 3, 4 and 5 in the folder labeled Other Exhibits.
3. A packet of additional medical records.
The pre-trial agreement dated June 12, 2000, which was submitted by the parties is incorporated by reference.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff, who was born January 4, 1949 and who is a high school graduate, began working for defendant's predecessor in December 1969. After working in the manufacturing area and then as an operator for a number of years, she took a secretarial position in 1988 and worked as a secretary until the time of the incidents giving rise to this claim. Her last position was secretary for Dale Posny, who worked in Human Resources. She started in that position in approximately November 1996. Her job involved typing, copying, recording attendance information, picking up and delivering mail, making travel reservations, handling telephone calls, shipping and receiving packages, ordering supplies, and storing the supplies in a cabinet. Some of her duties required her to leave her desk and go to other areas of the building.
2. Up until the spring of 1999, plaintiff and Ms. Posny had a good working relationship. However, Ms. Posny could not locate plaintiff for approximately three hours on a workday in April. There was no known reason for plaintiff to be away from her desk for so long, and Ms. Posny decided to impose a fifteen-minute time limit for errands and to monitor her more closely. Since there were some tasks that plaintiff could not complete within fifteen minutes, the restriction and monitoring activities led to resentment on her part. Ms. Posny also placed restrictions on the supplies that she could order. Their relationship became increasingly strained.
3. On May 21, 1999 plaintiff had to put some office supplies into the supply cabinet. When she lifted a box of manila envelopes and walked a few steps, she noted a twinge of pain in the area of her neck and left shoulder. She had had previous problems with her neck and shoulder, and had missed work on April 29 due to shoulder pain that she attributed to holding and caring for her grandchild. Shortly following the incident on May 21, 1999, she saw the company nurse and reported worse neck pain since lifting the box.
4. On May 26, 1999 plaintiff went to her regular medical practice and saw Margie Trent, the physician's assistant, for complaints of severe neck pain. She advised Ms. Trent that she had felt the twinge when lifting the box but did not develop severe pain until she went home that evening. Since she was also complaining of some numbness in her left arm, Ms. Trent ordered an MRI of her cervical spine and subsequently advised her to stay out of work from May 31 until June 7. Defendant then sent plaintiff to Dr. Wilcockson, the company doctor, who examined her on June 1, 1999 and concluded that she could return to work the next day with restrictions of no lifting, pushing or pulling more than five pounds. Consequently, she reported to work on June 2, 1999.
5. The MRI revealed narrowing and degenerative changes at C5-6 but no evidence of disk herniation or spinal cord compression. When plaintiff returned to Dr. Wilcockson on June 7, 1999, she indicated that she was significantly improved and only had a slight heavy feeling in her left arm. He then raised her restrictions to ten pounds.
6. Plaintiff continued working and did not seek further medical care until August 9, 1999 when she returned to Dr. Wilcockson and advised that, although she was much improved, she still had some left shoulder pain with extremes of motion plus some restriction of motion and weakness. Consequently, he continued her restrictions on a permanent basis. On August 11, 1999 she saw Ms. Trent for multiple complaints, including persistent pain in her left shoulder. Ms. Trent was concerned that she might have rotator cuff syndrome and ordered an x-ray before making a decision regarding whether she should be referred to an orthopedic surgeon. Apparently plaintiff continued to work with the ten-pound weight restriction throughout this time.
7. On August 19, 1999 Ms. Posny was advised that an office had to be cleaned out by noon because movers were coming to get the furniture at that time. She was unable to find plaintiff and began cleaning the office herself. There were a number of bound volumes that had to be emptied and removed. The binders varied in size but some were several inches thick. When plaintiff returned to her desk, Ms. Posny instructed her to help empty the binders and discard the contents. Consequently, plaintiff began opening them, removing the papers and then determining which bin the papers had to be placed in, since proprietary documents were kept in a separate container. She made several trips down the hall to take the papers to the appropriate containers. On each occasion she chose how much paper to carry and did not know the weights she was lifting. By the time the job was complete, her left shoulder was bothering her more, but she did not complain of any problems to Ms. Posny. However, on August 23, 1999 she went to Dr. Wilcockson and said that she had developed soreness in her left shoulder while emptying the binders on August 19.
8. Dr. Wilcockson referred plaintiff to Dr. Gramig, an orthopedic surgeon who was apparently under contract to render services to defendant's employees. Dr. Gramig examined her on August 26, 1999. She advised him that she was unable to raise her left arm at that time. He diagnosed her with adhesive capsulitis of the left shoulder and ordered an MRI of the shoulder. Defendant, however, then denied liability for the claim and Dr. Gramig did not accept her health insurance coverage, so he could not continue to treat her. Consequently, plaintiff returned to Ms. Trent on September 21 and was referred to Dr. Riggin, another orthopedic surgeon. Dr. Riggin saw her on September 27, 1999 and agreed that she had adhesive capsulitis. He treated her with a procedure where her shoulder was manipulated under anesthesia in order to break the adhesions. She then underwent aggressive physical therapy so that the scar tissue would not reform.
9. The condition of plaintiff's left shoulder improved significantly with Dr. Riggin's treatment. However, she experienced considerable stress associated with a conflict between Dr. Riggin's instructions to stay out of work and Dr. Wilcockson's insistence that she was able to work. It was not clear from the evidence why Dr. Wilcockson considered himself to be in as good a position as plaintiff's treating orthopedic surgeon to make such a determination and his actions appeared to have been inappropriate. Plaintiff continued to have considerable pain in the left shoulder, and the therapy that she had to undergo was quite painful. Dr. Riggin chastised her employer for applying pressure for her to return to work and advised them that she was not able to return to work.
10. Plaintiff went to Ms. Trent on December 14, 1999 with symptoms of anxiety and depression and with suicidal threats. Consequently, Ms. Trent referred her to Forsyth Medical Center where Dr. Williams, a psychiatrist, evaluated her. He determined that she had experienced a life-threatening incident as a twelve-year old when her father had accidentally run over her with a car causing severe injuries, that she experienced symptoms of rapid heart-beat, anxiety and panic over the years without recognizing that she had a problem, and that the shoulder injury along with the associated hospitalization and conflict with her employer had caused her symptoms to be aggravated to the point that she had developed a post-traumatic stress disorder with associated depression and panic disorder. He hospitalized her for treatment with medication and various forms of therapy, and she remained in the hospital until December 31, 1999.
11. Plaintiff's shoulder continued to improve and by February 2000 was doing well. Dr. Riggin released her to return to work beginning March 1, 2000 with respect to her shoulder condition. However, she continued to have serious psychiatric problems and was hospitalized a second time in March 2000. Dr. Williams had not released her to return to work with respect to her psychiatric condition as of the day his deposition was taken on August 30, 2000.
12. Claims have been filed for both the May 21 and the August 19, 1999 incidents. Although defendant initially provided medical treatment for each injury, liability was ultimately denied for both workers' compensation claims. Nevertheless, defendant authorized treatment by Dr. Wilcockson and by Dr. Gramig prior to notifying the doctors that the claim was being denied.
13. On May 21, 1999 plaintiff lifted a box of manila envelopes in a normal manner. There was nothing unusual about the weight of the box or the circumstances when she lifted it. She routinely lifted and carried boxes of envelopes as part of her regular job duties of placing office supplies in the supply cabinet. This event constitutes a specific traumatic incident of the work assigned and she did sustain a neck injury as a result of the incident, which constitutes a compensable injury by accident arising out of and in the course of employment.
14. As a result of the neck injury on May 21, 1999, plaintiff was unable to work for only two days. She was then able to earn her regular wages while working in a light duty capacity. No medical treatment was provided for the neck problem after June 1999 and there was no evidence presented indicating that she sustained any permanent partial disability as a result of the neck injury.
15. On August 19, 1999 when plaintiff emptied the binders, she was performing one of her regular job duties. There was nothing unusual or out of the ordinary in the manner that she removed the papers from the binders or carried them to the bins on that occasion. She did not prove that she lifted an unusual or excessive amount of weight on that date. Consequently, she did not sustain a compensable injury to her left shoulder on August 19, 1999.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. (I.C. NO. 970196) On May 21, 1999 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant in that she sustained a cervical injury as the result of a specific traumatic incident of the work assigned. G.S. § 97-2 (6).
2. (I.C. NO. 970196) Having been disabled for only two days as a result of that injury, plaintiff's disability did not exceed the seven-day waiting period and she is not entitled to compensation for temporary total disability. G.S. § 97-28.
3. (I.C. NO. 970196) To the extent that plaintiff received treatment for a neck condition, plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. G.S. § 97-2 (19); G.S. § 97-25.
4. (I.C. NO. 970196) However, a shoulder injury must meet the standards of an injury by accident in order to be compensable. An "accident" must involve more than merely carrying on the usual and customary duties in the usual way, but rather involves the interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Harding v. Thomas and HowardCompany, 256 N.C. 427 (1963).
5. (I.C. NO. 970196) On May 21, 1999, plaintiff did not sustain a compensable injury by accident to her shoulder arising out of and in the course of her employment with defendant-employer. G.S. § 97-2 (6).
6. (I.C. NO. 970196) Plaintiff is not entitled to benefits under the Workers' Compensation Act for her shoulder injury, except for the medical treatment authorized by defendant. G.S. § 97-2 et seq.
7. (I.C. NO. 970192) On August 19, 1999 plaintiff did not sustain an injury by accident to her left shoulder arising out of and in the course of her employment with defendant-employer. G.S. § 97-2(6). Consequently, plaintiff is not entitled to benefits under the Workers' Compensation Act for her shoulder injury or the subsequent psychiatric problems related to her shoulder injury. G.S. § 97-2 et seq.
8. (I.C. NO. 970192) However, because defendant authorized the treatment by Dr. Wilcockson and Dr. Gramig, defendant is liable for payment to those providers. G.S. § 97-90(e).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. (I.C. NO. 970196) To the extent plaintiff injured her neck, this claim is compensable. However, the claim is denied with respect to any shoulder injury.
2. (I.C. NO. 970196) Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident to the extent the treatment was rendered for her neck injury.
3. (I.C. NO. 970192) This claim, arising from plaintiff's alleged psychological difficulties subsequent to the August 19, 1999 shoulder incident, must, under the law, be and it is hereby denied.
4. (I.C. NO. 970192) However, defendant shall pay all medical expenses arising from the treatment by Dr. Wilcockson and Dr. Gramig, which defendant authorized.
5. (I.C. NO. 970196) Defendant shall pay the costs of this appeal.
6. (I.C. NO. 970192) Each side shall pay its own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/______________ RENE C. RIGGSBEE COMMISSIONER